**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**UNITED STATES OF AMERICA**

vs.                                4:08CR00007-01 WRW

**NEIL HAVLIK**

**<u>ORDER</u>**

Pending is Defendant's Motion to Suppress Statements (Doc. No. 19). The Prosecution has responded (Doc. No. 25). On May 19, 2009, I heard argument in connection with the pending Motion, as well as Defendant's Motion to Suppress Evidence (Doc. No. 21), which I denied at the hearing. At the end of the hearing, I requested additional pleadings from the parties on the Motion to Suppress Statements. After reviewing the parties' briefs,[1] and considering the evidence that was presented at the May 19, 2009, hearing, Defendant's Motion to Suppress Statements (Doc. No. 19) is DENIED.

**I.    DISCUSSION**

Defendant contends any statements he made to officers during the search of his property should be suppressed because the prosecution "1) . . . failed to prove a *Miranda* waiver was given knowingly, voluntarily, and intelligently and 2) the officers violated the rule of *Edwards v. Arizona*[2] by continuing to question Havlik and reinitiating contact with him after he invoked his right to counsel."[3]

---

[1] Doc. Nos. 28, 31.

[2] 451 U.S. 477 (1981).

[3] Doc. No. 31.

1

### A.     Defendant's Miranda Rights

A defendant's waiver of his Fifth Amendment right to self-incrimination must be knowing, intelligent, and voluntary.[4] To determine if a statement was made voluntarily, a court must consider, in light of the totality of the circumstances -- "including an examination of both the conduct of the officers and the characteristics of the accused" -- if law enforcement officers obtained the statement by overbearing the will of the accused.[5]  Courts look at a number of factors to determine whether an accused's will was overborne, including the accused's mental state, intelligence, and any other factor that might make him particularly susceptible.[6]

Defendant asserts that because his will was overborne by the combination of his injury and the lengthy interrogation, he did not make a knowing, intelligent, and voluntary waiver of his *Miranda* rights.  Defendant cites *Mincey v. Arizona*[7] in support of his argument. In *Mincey*, the defendant was lying on his back in a bed in the intensive care unit of a hospital; was depressed almost to the point of coma; suffered from unbearable pain in his leg; produced written answers that, on their face, were not coherent; and was "encumbered by tubes, needles, and breathing apparatus."[8]

In this case, Defendant was examined by both an ambulance crew and doctors on the day that he made his statement. Dr. E. J. Chauvin, a cardiothoracic and trauma surgeon, was a

---

[4]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[5]*Wilson v. Lawrence County*, 260 F.3d 946, 952 (8th Cir. 2001).

[6]*Id*. at 953.

[7]437 U.S. 385, 402 (1978).

[8]*Id*. at 399.

member of the SWAT team that entered Defendant's property in March, 2007.[9] After Defendant complained of pain, Dr. Chauvin examined him and saw a small, round indentation on Defendant's chest.[10] Dr. Chauvin examined Defendant's ribs, but found no obvious fracture, and determined that Defendant's breathing sounded good.[11] It was decided that if Defendant was still having chest pain, the paramedics or an ambulance should be called.[12] An ambulance was later called.

Darvin Reno was one of the GEMS Ambulance Service employees who was dispatched to Defendant's property on March 22, 2007.[13] Mr. Reno testified that when he arrived he observed Defendant sitting on the hood of a vehicle, dazed and confused.[14] Mr. Reno testified that Defendant's blood pressure was unreasonably high, his heart rate was extremely high, and that he was shaking, and showing signs of being scared.[15] When asked if he saw any wounds on Defendant, Mr. Reno answered that he saw a red spot on Defendant's chest.[16] Mr. Reno stated

---

[9] Tr. of May 19, 2009, Hearing at 129. (Doc. No. 27.)

[10] *Id*. at 131.

[11] *Id*.

[12] *Id*.

[13] *Id*. at 67.

[14] Tr. of May 19, 2009, Hearing at 67. (Doc. No. 27.)

[15] *Id*. at 68.

[16] *Id*.

3

that he asked Defendant three times if he wanted to go to the hospital, and that Defendant said "no."[17] Mr. Reno also testified that Defendant had calmed down by the time Mr. Reno left.[18]

This case is distinguishable from *Mincey*. Here, Defendant was not hospitalized in an intensive care unit. He was not encumbered by tubes and needles and medical equipment. The transcript[19] of the officers' discussion with Defendant does not reveal any answers by Defendant that were incoherent. Rather, Defendant's answers during the initial encounter show that Defendant responded coherently, despite Defendant's pain. Further despite his pain, Defendant continuously disputed the officers' right to be on Defendant's property unless he was being arrested, and Defendant expressed concern about his dogs. I find that neither Defendant's physical nor mental state rendered him particularly susceptible to having his will overborne by the officers' actions.

I also find the officers' actions reasonable while they were on Defendant's property. Defendant's property was in a rural area; multiple structures and cars dotted the property.[20] The property was protected by approximately ten Doberman Pincers.[21] Defendant did not comply when he was told multiple times to get down on the ground, and was struck with a bladed

---

[17]*Id*.

[18]*Id*.

[19]May 19, 2009, Hearing, Government Exhibit G.

[20]May 19, 2009, Hearing, Government Exhibits B1-B6.

[21]See May 19, 2009, Hearing, Government Exhibit B6; Tr. of May 19, 2009, Hearing at 87. (Doc. No. 27).

4

forearm thrust[22] to the chest to force him to the ground.[23] Officers tried to read Defendant his *Miranda* rights to him for about twenty minutes before they stopped. The transcript[24] of the conversation shows that Defendant did not understand his rights because, to his knowledge, unless one is being arrested there is no reason for one to be informed of his *Miranda* rights.[25] At one point, Defendant began discussing the pornographic video, but Inspector Nappier told him: "I can't talk to ya until you're advised of your rights."[26] Almost immediately after, Officer Carter told Defendant that he had the right to remain silent, and asked him if he understood that right.[27] Defendant answered: "Yeah."[28] Later, Defendant was examined by Mr. Reno, who testified that officers did not interact with Defendant during the exam, and that Defendant had calmed down by the time the ambulance service left. Defendant signed the waiver only after Mr. Reno's examination. The officers' behavior did not overcome Defendant's will.

**B.     Invoking the Right to Counsel**

To invoke his right to counsel, a suspect must make a request "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for

---

[22]A bladed forearm thrust is a forward motion of the forearm held horizontally to the upper body of the person being subdued.

[23]Tr. of May 19, 2009, Hearing at 97. (Doc. No. 27.)

[24]May 19, 2009, Hearing, Government Exhibit G.

[25]Tr. of March 22, 2007, Questioning, at 1 - 16. May 19, 2009, Hearing, Government Exhibit G.

[26]*Id.* at 13.

[27]*Id.*

[28]*Id.*

an attorney."[29] After an accused invokes his right to have counsel present during questioning, officers may not interrogate the accused further -- unless the accused initiates the contact.[30] An interrogation includes both direct questions and actions that officers should know will likely elicit an incriminating response from an accused.[31]

Shortly before Defendant was examined by Mr. Reno, Officer Carter told Defendant: "You have the right to talk to a lawyer for advise [sic] before we ask you any questions and to have him with you during the questioning."[32] Defendant answered: "I don't have a lawyer. I guess I need to get one . . . ."[33] Officer Carter continued: "If you cannot afford one, one will be appointed for you. If you wish. Do you understand that?"[34] Defendant responded: "I guess you better get me a lawyer then."[35] Officer Carter then said: "If you decide to answer questions now without a lawyer present, you will still have the right to stop answering questions at any time. You have the right to stop answering questions at any time until you talk to an attorney, lawyer. You understand that?"[36] Defendant answered "I don't understand any of it. I really don't."[37]

---

[29] *Davis v. United States*, 512 U.S. 452, 459 (1994).

[30] *Edwards v. Arizona*, 451 U.S. 477 (1981).

[31] *United States v. Londondio*, 420 F.3d 777, 783 (8th Cir. 2005).

[32] Tr. of March 22, 2007, Questioning, at 14. May 19, 2009, Hearing, Government Exhibit G.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

After Defendant said that he did not understand "any of it," Officer Luter started over -- he advised Defendant of his right to talk to an attorney before questioning. Defendant said he understood.[38] Defendant also said he understood that an attorney would be appointed to him if he could not afford one.[39] Inspector Nappier then told Defendant: "alright Neal [sic]. You understand the waiver portion. I'm gonna need you to sign this."[40] Defendant said he could not, because things were "all blurry."[41] The conversation turned to having a doctor examine Defendant,[42] and Defendant was later examined by Mr. Reno.

First, I find that Defendant did not make a statement "that can reasonably be construed to be an expression of a desire for the assistance of an attorney."[43] After Defendant stated he understood his right to counsel and said "I guess you better get me a lawyer then," Defendant recanted and stated that he didn't understand "any of this." Officer Luter started anew and informed Defendant of his rights, which Defendant said he understood, but Defendant did not then express his desire for an attorney.

Second, while invocation of counsel does prohibit further interrogation, it does not prohibit all further contact. Even if Defendant did invoke his right to counsel, I credit Inspector

---

[38]Tr. of March 22, 2007, Questioning, at 15. May 19, 2009, Hearing, Government Exhibit G.

[39]*Id.*

[40]*Id.*

[41]*Id.* at 16.

[42]*Id.*

[43]*Davis v. United States*, 512 U.S. 452, 459 (1994) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)).

Nappier's testimony that Defendant continued his remarks about the officers not having a right to be on his property, and that he did not know why the officers were there.[44] Inspector Nappier showed Defendant the check with which Defendant had paid for the porn videos.[45] I find that Inspector Nappier showed Defendant the check in response to Defendant's banter in an effort to get him to "shut . . . up,"[46] and not in an effort to elicit an incriminating response. After Inspector Nappier showed Defendant the check, Defendant agreed to talk to the officers and signed the waiver. I find Defendant knowingly, intelligently, and voluntarily waived his right to counsel.

## CONCLUSION

Based on the findings of fact and conclusions of law above, Defendant's Motion to Suppress Statements (Doc. No. 19) is DENIED.

IT IS SO ORDERED this 14th day of July, 2009.

/s/Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE

---

[44]Tr. of May 19, 2009, Hearing at 18-19. (Doc. No. 27.)

[45]*Id*. at 19.

[46]*Id*.